IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| FEDERAL TRADE COMMISSION, | ) |
| Plaintiff, | ) ) ) |
| v. | ) No. 06 C 2574 |
| DATACOM MARKETING INC. ET AL | ) ) ) |
| Defendants. | ) |

MEMORANDUM OPINION AND ORDER

JAMES F. HOLDERMAN, District Judge:

On May 9, 2006, plaintiff Federal Trade Commission, ("FTC"), filed a three-count complaint alleging that defendants Datacom Marketing Inc., Datacom Direct Inc., and its corporate owners, officers and directors Bernard Fromstein, Judy Provencher, Paul Barnard, Judy Neinstein and Stanley Fromstein,[1] violated § 5(a) of the FTC Act of 1914, as amended, 15 U.S.C. § 45(a), by engaging in deceptive acts and practices in or affecting commerce. (Dkt. No. 1). Pending before the court is the FTC's motion for a preliminary injunction which accompanied the FTC's request for a temporary restraining order ("TRO") and other equitable relief. (*See* the FTC's proposed order at Dkt. No. 9). After conducting a hearing on May 24, 2006, this court grants the FTC's motion for preliminary injunction for the reasons set forth below.

---

[1] Defendants Datacom Marketing Inc. and Datacom Direct Inc. have appeared and opposed the FTC's requested preliminary injunction. The individual defendants were served by the FTC but they have not appeared in this case. (Dkt. Nos. 40-42, 45, 46). The court will referred to the corporations as the "corporate defendants," the individuals as the "individual defendants," and all defendants as "defendants."

BACKGROUND

A. Procedural History

The FTC's complaint was filed under seal on May 9, 2006. (Dkt Nos. 7, 13, 20). The seal was lifted on May 11, 2006 at 12:00 p.m. Central Daylight Savings Time. (Dkt. No. 20). All filings in this case have been placed on this court's public docket. Accompanying the FTC's complaint on May 9, 2006 was the FTC's *ex parte* request for a TRO. (Dkt. Nos. 1, 7, 8, 10, 13). The court granted the TRO on May 9, 2006, took the motion for preliminary injunction under advisement and set a status for May 15, 2006. (Dkt. Nos. 16, 17). The court in its TRO found that there was good cause to believe that: (1) the defendants had violated Section 5(a) of the FTC Act and therefore the FTC was likely to prevail on the merits, (2) irreparable harm would result by the defendants ongoing violations of the FTC Act unless the defendants were restrained, (3) there was irreparable damage to the court's ability to grant effective relief unless the defendants' ability to conceal or dispose of their assets was restrained, and (4) the equities favored the issuance of the TRO.[2] (Dkt. No. 17 at pgs. 2-3).

The TRO ordered: (1) the defendants restrained from engaging in unfair or deceptive acts or practices in or affecting commerce, creating other business, or disclosing customer information to third parties, (2) the freezing of the defendants assets and mail, (3) the defendants to provide the FTC with complete financial information and consent to the release of financial records to the FTC, (4) third parties restrained from assisting the defendants in the collection of accounts, (5) the preservation of all records, and, (6) expedited discovery. (*Id.* at pgs. 6-18).

---

[2] No security was required for the issuance of the TRO because the FTC is an agency of the United States. *See* Fed. R. Civ. P. 65(c).

The court signed and entered the TRO on May 9, 2006 at 11:25 a.m. (*Id.* at pg. 21). The terms of the TRO set for it to expire on May 19, 2006 at 11:59 p.m. (*Id.*) Counsel for the FTC and the corporate defendants appeared before the court on May 15, 2006 and the court set the preliminary injunction hearing for May 24, 2006. (Dkt. No. 22).

On May 18, 2006, the FTC file a first motion *in limine* for an order admitting the sworn declarations of nineteen consumers and two law enforcement officers that the FTC submitted as exhibits on May 9, 2006 in support of its motion for a TRO and preliminary injunction. (Dkt. No. 25). On May 23, 2006, the FTC filed a second motion *in limine* seeking the admission of business records. (Dkt. No. 33). The court granted both of these motions. (Dkt. Nos. 37, 38, 53). On May 19, 2006, the corporate defendants appeared before Judge William Hibbler, who was sitting as the district's emergency judge, seeking the unfreezing of their assets. (Dkt. No. 29). Judge Hibbler allowed the payment of $11,448.00 of group medical insurance but denied all other relief. (Dkt. No. 32). On May 23, 2006, the corporate defendants filed a motion in limine to exclude the testimony of the FTC's previously undisclosed witnesses Carol Chatburn and Douglas McKenney. (Dkt. No. 49). That motion was taken under advisement and these witnesses were permitted to testify as an offer of proof. (Dkt. No. 54).

B. Factual Background

According to the May 9, 2006 complaint, the FTC alleged that the corporate defendants were located in Toronto, Canada but transacted business in the Northern District of Illinois and throughout the United States. (Dkt. No. 1 at pgs. 2-3). The complaint does not allege the location of the individual defendants but does allege that they too transacted business in both the Northern District of Illinois and throughout the United States. (*Id.* at pgs. 3-4). The FTC alleged

3

that the defendants have engaged in a common enterprise sharing officers, employees, office locations and commingling funds in furtherance of their scheme to engage in unfair or deceptive acts or practices in or affecting commerce. (*Id.* at pgs. 5).

The deceptive scheme involved the selling of business directories. The FTC contends that sales in the alleged scheme exceeds $1 Million per month.[3] According to the witness declarations filed by the FTC, the defendants' scheme started with the defendants' telemarketers "cold calling" businesses and organizations in the United States and often asked the receiving caller to verify information such as the business' name, address and telephone number for their directories. (Dkt. No. 12 at Exs. PX 2, ¶ 5; PX 5, ¶ 5; PX 8, ¶ 5; PX 10, ¶ 5; PX 11, ¶ 5; PX 16, ¶ 6; PX 17, ¶ 9; PX 22, ¶5).[4] Other times, the defendants asked whether the business or organization wanted to be listed in the directories or described the directories. (*Id.* at Exs. PX 2, ¶ 5; PX, 11 ¶ 5). The FTC's position is that the defendants' initial call usually did not indicate that the purpose of the call was to sell their directories, but instead was designed to make the other party believe that it merely confirmed preexisting information already listed in a telephone directory. (*Id.*) The alleged goal was to make the consumer businesses and organizations believe that they already had a preexisting business relationship with the defendants. (*Id.* at Exs. PX 7, ¶ 7; PX 8, ¶ 6; PX 17, ¶ 8).

A second call was placed later that day or the next day to verify contact information allegedly for shipping purposes. (*Id.* at Exs. PX 1, ¶ 12; PX 2, ¶ 10; PX 7, ¶¶ 7, 8). The second call was recorded and the telemarketer asked a series of quick, leading closed-end "yes" or "no"

---

[3] All dollar amounts are in American dollars unless otherwise noted.

[4] Docket Number 12 contains the FTC's 21 sworn declarations, 19 from consumers and two from law enforcement, provided in support of the FTC's factual allegations.

questions. (*Id.* at Ex. PX 7, ¶ 8). Despite the fact that the defendants' call script required the telemarketer to mention that a directory costing $399.00 would be mailed to the consumer, (*Id.* at Ex. PX 19, pg. 26), the FTC alleged that actual practice was not mentioned unless the consumer pushed for that information. (*Id.* at Exs. PX 2, ¶ 5; PX 7, ¶ 7, PX 10, ¶ 5; PX 16, ¶ 6; PX 17, ¶ 8; PX 22, ¶ 5). The FTC's proof established that a directory was then shipped to the consumer from a New Hampshire mail drop but consumers found the directory to be useless because its contained missing, inaccurate or incomplete information. (*Id.* at Exs. PX 1, ¶ 7; PX 2, ¶ 7).

An invoice for the $399.00 price ($379 plus $20 for shipping and handling) would be sent to the consumer approximately a week to one month after the directory was delivered. (*Id.* at Exs. PX 1, ¶ 6; PX 2, ¶ 7; PX 3, ¶ 9; PX 5, ¶ 7; PX 6, ¶ 5; PX 7, ¶ 11; PX 9, ¶¶ 5, 10; PX 10, ¶¶ 6, 8; PX 11, ¶ 4). The invoice typically listed the person who answered the original call as the individual who authorized the purchase of the directory. (*Id.*) The invoice instructed payment to be sent to the New Hampshire mail drop. (*Id.*) According to the FTC, the alleged business and organization victims often pay these invoices despite the alleged worthless value of the directory because they are unaware that they never intended to order the directory, there was confusion caused by the listing of the name of the person who first received the call on the invoice, or to resolve the dispute over the charge. (Dkt. No. 11 at pgs. 8-9 (citing Dkt. No. 12)). The FTC also alleged that other businesses and organizations who disputed the charge were pursued by collection agencies. (Dkt. No. 12 at Exs. PX 3, ¶¶ 14, 15; PX 9, ¶¶ 11, 14).

The FTC further alleges that the defendants engage in various other fraudulent and misleading follow up methods designed to convince the consumer businesses and organizations that they owe the defendants money. These allegedly deceptive practices include: (1) the use of

5

the responses from the prior recorded conversations out of context in an attempt to demonstrate consent to purchase, (*Id.* at Ex. PX 21, ¶ 5), (2) repetitive billing after an account has already been paid originally in error in an attempt to get a second duplicative erroneous payment, (*Id.* at Ex. PX 19, *passim*), (3) sending invoices with shipping terms such as "invoice payable net 15 days" to make it appear that someone authorized the purchase, (*Id.*), and (4) following up on unpaid invoices referring unpaid accounts to a third-party debt collection agency that threatens legal action and harm to credit ratings. (*Id.* at Exs. PX 3, ¶¶ 14, 15; PX 9, ¶¶ 11, 14).

## STANDARD OF REVIEW

"Section 13(b) of the FTC Act, 15 U.S.C. § 53(b), specifically provides for injunctive relief for consumers harmed by unfair or deceptive acts or practices in or affecting commerce." *FTC v. Fin. Res. Unlimited, Inc.*, No. 03 C 8864, 2006 WL 1157612, at *11 (N.D. Ill. Apr. 25, 2006). This court's injunctive authority includes the ability to grant ancillary relief including repayment of money to the consumers as restitution or recession. *FTC v. Febre*, 128 F.3d 530, 534 (7th Cir. 1997) (citing *FTC v. Amy Travel Serv., Inc.*, 875 F.2d 564, 571-72 (7th Cir. 1989)).

"This court reviews the FTC's request for an injunction pursuant to 15 U.S.C. § 53(b) under the 'public interest' test, which requires that this court to (1) determine the FTC's likelihood of success on the merits, and (2) balance the equities." *FTC v. Phoenix Avatar, LLC*, No. 04 C 2897, 2004 WL 1746698, at *8 (N.D. Ill. July 30, 2004) (citing *FTC v. Word Travel Vacation Brokers, Inc.*, 861 F.2d 1020, 1028-29 (7th Cir. 1988)). "In considering those two factors, the court employs a 'sliding scale so that the greater the [FTC's] success on the merits, the less harm [it] must show in relation to the harm [the defendants] will suffer if the preliminary

injunction is granted.'" *FTC v. Growth Plus Intern. Mkt., Inc.*, No. 00 C 7886, 2001 WL 128139, at *2 (N.D. Ill. Jan. 9, 2001) (quoting *Kinney v. Local 150*, 994 F.2d 1271, 1277 (7th Cir. 1993)). This court must give greater weight to the public equities than to the private equities, but private equities become a greater concern when the defendant can demonstrate irreparable harm from the proposed injunction. *Phoenix Avatar, LLC*, No. 04 C 2897, 2004 WL 1746698, at *9 (citing *FTC v. Elders Grain, Inc.*, 868 F.2d 901, 903 (7th Cir. 1989); *World Travel Vacation Brokers, Inc.*, 861 F.2d at 1029; *FTC v. Weyerhaeuser Co.*, 665 F.2d 1072, 1083 (D.C. Cir. 1981)) "The sliding scale approach is not mathematical in nature, rather it is more properly characterized as subjective and intuitive, one which permits district courts to weigh the competing considerations and mold appropriate relief." *Id.* (quoting *Ty, Inc. v. Jones Group Inc.*, 237 F.3d 891, 896 (7th Cir. 2001)).

## ANALYSIS

A. The FTC's Likelihood of Success on the Merits

The FTC argues that the defendants have violated § 5, 15 U.S.C. § 45(a), of the FTC Act. Section 5(a) prohibits "unfair or deceptive acts or practices in or affecting commerce." 15 U.S.C. § 45(a)(1). "To establish an act or practice is deceptive, the FTC must establish that the representations, omissions, or practices likely would mislead consumers, acting reasonably, to their detriment." *FTC v. Consumer Alliance, Inc.*, No. 02 C 2429, 2003 WL 22287364, at *4 (N.D. Ill. Sept. 30, 2003) (quoting *World Travel Vacation Brokers, Inc.*, 861 F.2d at 1029). "Misrepresentations of material facts made for the purpose of inducing consumers to purchase goods or services also constitute unfair or deceptive acts or practices that are forbidden by Section 5(a). A statement or practice is material if it is likely to affect the consumer's decision

7

to buy the product or service." *FTC v. World Media Brokers Inc.*, No. 02 C 6985, 2004 WL 432475, at *6 (N.D. Ill. Mar. 2, 2004) (citing *World Travel Vacation Brokers, Inc.*, 861 F.2d at 1029).

The FTC has demonstrated that the defendants have engaged in deceptive acts and practices that violate § 5(a) of the FTC through the conduct of their business. The defendants have mislead consumers into erroneously believing that the defendants had a previous business relationship with their businesses and organizations when none existed, that the consumers decided to buy the defendants' directories when they did not through the use of invoices listing the names of consumers and playing back recorded phone calls, double paying for directories through a conscious duplicative billing strategy, and threatening debt collection and potential legal action against consumers who challenged the defendants' claims for money. The FTC has also demonstrated that the individual defendants had the authority to control the defendant corporations' deceptive practices and therefore they can be held jointly and severally liable as individuals. *See FTC v. World Media Brokers*, 415 F.3d 758, 764 (7th Cir. 2005).

The corporate defendants have argued that they have implemented new policies and procedures to correct any deficiencies in their prior procedures. The corporate defendants presented the testimony of their president Charles Farrugia ("Farrugia") at the hearing in support of their position that the corporate defendants are not currently engaging in deceptions that violate § 5(a). Farrugia testified that he has changed the previous employee manual, improved training for the telemarketers, who are referred to as Telephone Sales Representatives ("TSRs"), and revised the sales script used by the TSRs when contacting prospective customers. Farrugia also testified that he increased the monitoring of the TSRs working for the corporate defendants.

The court has fully considered Farrugia's testimony. The FTC, however, effectively refuted the testimony of Farrugia with the declaration of the FTC's Paralegal Specialist Douglas McKenney ("McKenney"). McKenney's declaration was signed, filed and provided to the corporate defendants' counsel on May 23, 2006. (Dkt. Nos. 58-61).[5] McKenney, according to his declaration, received the mail from the defendants' New Hampshire mail drop under the terms of the TRO over the past several days since May 9, 2006. McKenney contacted these consumers and his declaration reports his telephone conversations with these consumers. McKenney's declaration demonstrates that the defendants continue to engage in deceptive activities. Furthermore, even if the defendants were complying with the law at this point, they still have what the FTC has shown are ill gotten gains from their prior activities that must be returned as restitution to the harmed consumers.

B. Balancing of the Equities

The public equities also favor the FTC's proposed injunction. The public has an interest in being free from the defendants' demonstrated deceptive practice. The public also has an interest to ensure just compensation be restored to the victims who suffered proven monetary damages when this case concludes. The freezing of the defendants' assets shall greatly increase the possibility that the victims will receive appropriate restitution. Additionally, there is minimally no private interest weighing in favor of the defendants because the evidence

---

[5] Corporate defendants objected to the late filing of McKenney's declaration. The court notes that the first telephone interview by McKenney took place on May 16, 2006 at 11:00 a.m. (Dkt. No. 59 at CS 1) and the last telephone interview by McKenney of a consumer reported in McKenney's declaration took place on May 23, 2006 at 2:30 p.m. (Dkt. No. 61 at CS 18). The court allowed the corporate defendants' counsel to cross examine McKenney during the preliminary injunction hearing conducted on the afternoon of May 24, 2006 and corporate defendants' counsel also cross examined Carol Chatburn who was called by the FTC in rebuttal. Corporate defendants' motion in limine of May 23, 2006 to exclude previously undisclosed witnesses (Dkt. No. 49) is denied.

establishes that they have been engaging in practices that violate § 5(a) and there is little evidence in the record that the defendants have been engaging in lawful activities as to the victim consumers that the defendants contacted and billed.

The court understands the defendants' arguments that this order could effectively end the defendants' business. The defendants, however, still have the option of attempting to reach a settlement with the FTC. This court must protect the public from the defendants' proven and continuing pattern of deceptive activities, and the insure proper restitution to the victims the asset freeze.

## CONCLUSION

For the reasons set forth above, this court grants the FTC's motion for preliminary injunction. Corporate defendants' motion in limine of May 23, 2006 to exclude previously undisclosed witnesses (Dkt. No. 49) is denied. The provisions of the May 9, 2006 Temporary Restraining Order (Dkt. No. 16, 17) are reissued in this preliminary injunction order and will remain in effect until a further order of court or the completion of a trial on the merits which ever occurs earlier. The parties are encouraged to discuss settlement. The case is set for a report on status on June 20, 2006 at 9:00 a.m.

ENTER:

*James F. Holderman*
JAMES F. HOLDERMAN
United States District Judge

Date: May 24, 2006